IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| STEVE RIDDICK, <br> a.k.a. STEVEN RIDDICK, <br><br> Plaintiff, <br> v. <br><br> WARDEN JEFFERY B. KISER, ET AL., <br><br> Defendants. | CASE NO. 7:20CV00081 <br><br><br> MEMORANDUM OPINION <br><br> By: Glen E. Conrad <br> Senior United States District Judge |

Plaintiff Steve Riddick, also known as Steven Riddick, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that prison officials used excessive force against him, denied him adequate medical care, and deprived him of due process. The matter is before the court this day on a motion for summary judgment filed by Defendants Deborah Ball, Mary Cantrell, and Wendy McCoy, asserting Riddick's failure to exhaust administrative remedies. After review of the record, the court concludes that the defendants' motion must be granted.[1]

I.

In the amended complaint, Riddick alleges that on April 5, 2019, at Red Onion State Prison ("Red Onion"), he refused to comply with orders to come to his cell door to be handcuffed. Correctional officers allegedly sprayed him three times with O.C. spray[2] and took him to the floor to place him in restraints, where one officer punched him four times in the ribs. After allowing

---

[1] A motion for summary judgment by other defendants and Riddick's motion for default judgment will be separately addressed.

[2] O.C. spray is a chemical agent similar to what is commonly known as pepper spray or mace: it irritates a person's eyes, throat, and nose. See, e.g., Park v. Shiflett, 250 F.3d 843, 849 (4th Cir. 2001) (describing the physiological effects of O.C. spray).

him to shower off the O.C. spray, the officers applied "ambulatory restraints."[3]  Am. Compl. 10,[4] ECF No. 12.

Nurse Cantrell assessed Riddick's condition just after the officers applied the ambulatory restraints.  Riddick allegedly told the nurse that his ribs hurt from being punched, he thought they were broken, he needed an ice pack, he had chest discomfort, he was asthmatic, and he needed an inhaler after being sprayed with O.C. spray.  Nurse Cantrell did not provide him any medical care. See id. at 10-11, 15.

Officers then placed Riddick in a cell, where he allegedly remained in the ambulatory restraints for eight hours.  In adjusting the restraints, officers allegedly squeezed the handcuffs too tight around his wrists, cutting off blood flow, causing bruises to his wrists and swelling in his left hand.  Riddick states that his "wrist [and] hands stayed numb for two months," his "left ribs were sore for a month," and one rib "stuck outward as if it was fractured." Id. at 12.

On April 8, 2019, Riddick filed a request for medical attention, complaining about numbness and pain in his wrist and hands, pain in his left ribs, and pain in his stomach and lower back.  The next day, Nurse Practitioner Ball ("NP Ball") examined Riddick.  He allegedly told her the pain in his ribs (which he believed were fractured) was a 7 out of 10, pointed out that one rib was sticking out and a vein in one hand was swollen, told her he had been sprayed three times with

---

[3]  Riddick does not describe the ambulatory restraints placed on him on April 5, 2019.  For context only, the court takes judicial notice of a description of this restraint method from another Virginia inmate's § 1983 case:
> [W]hen an inmate is placed in ambulatory restraints, the inmate wears leg irons and handcuffs, which are double locked, and a black box is placed over the center portion of the handcuffs, covering the keyhole.  A security waist chain is then placed through the black box and down to the leg irons, with just enough length to allow the inmate to stand completely upright, but limiting his movement. [An] inmate in ambulatory restraints is able to use the bathroom, wash himself, feed himself, and walk around, but that he cannot lift his arms above his head or swing his arms around.

Blount v. Williams, No. CIV A 705CV00556, 2007 WL 951555, at *7 (W.D. Va. Mar. 26, 2007).

[4]  In this memorandum opinion, for the sake of consistency, the court uses the page numbers assigned by the court's docketing program, CM-ECF, rather than the page numbers of Riddick's handwritten pleadings.

O.C. spray as an asthmatic, said he had asked for an ice pack and an inhaler without success, complained of stomach and back pain from the rib injury, told her it hurt to cough or sneeze, and explained that his hands were "without feeling." Id. at 16-17.  NP Ball rubbed his hands, but she said she could not do anything for the numbness, which she said was probably caused by irritation of nerves.  Nurse McCoy, who was with NP Ball, said that because four days had passed since the injury to his ribs, "they couldn't give [him] an ice pack," even though he reported being more sore than he had been during the previous three days.  Id. at 17.  NP Ball prescribed Tylenol.  On April 12, 2019, Riddick underwent X rays of his left ribs.

On April 23, 2019, Riddick filed a request for medical care, and on April 24, 2019, he filed an emergency grievance, complaining in both forms that his wrist and hands were still numb and he still had pain in his stomach and lower back.  On April 24, 2019, a nurse responded that his situation did not meet the definition of an emergency, that he should use a sick call request to seek medical care if his pain continued, and that he had been placed on sick call.  About a week later, NP Ball examined Riddick.  He allegedly reported that he "was having the same issues." Id. at 19.  NP Ball said again that she could not do anything for his hands.  In response to a sick call request in early May 2019, Riddick was placed on chart review.

Riddick filed an informal complaint in June 2019 about the continued numbness in his hands.  Thereafter, on June 26, 2019, he had an appointment with NP Ball and allegedly asked her to refer him to "a hand specialist." Id.  On June 28, 2019, Riddick underwent X rays of his hands to see if any bones had been structurally damaged.  Around the same time, medical staff put in a request for Riddick to see a neurologist.  In October 2019, Riddick had an examination at a local hospital and was allegedly told he would be scheduled for a "nerve test," but this procedure had not yet occurred when he filed the amended complaint in May 2020.  Id. at 20-21.  Riddick alleges

3

that for months, the numbness in his hands has caused him to drop small items like cups and pens.[5]

Liberally construing the amended complaint, Riddick alleges the following claims against the movant defendants: (1) on April 5, 2019, Nurse Cantrell failed to provide Riddick an inhaler and an ice pack while he was in ambulatory restraints; (2) on April 9, 2019, NP Ball and Nurse McCoy failed to provide Riddick an inhaler, an ice pack, pain medication, or treatment for his numb hands; (3) NP Ball caused Riddick to go without pain medication for his sore ribs for two months (April and May 2019); and (4) NP Ball waited "nearly three months" to refer Riddick to a neurologist for the numbness in his hands. See gen. id. at 23-24.

In support of their summary judgment motion, ECF No. 39, NP Ball, Nurse Cantrell and Nurse McCoy assert that Riddick failed to exhaust available administrative remedies as to his claims against them before filing this § 1983 action, as required under 42 U.S.C. § 1997e(a). In support of their motion, they submit the declaration of T. Trapp, grievance coordinator, who is responsible for maintaining the grievance files of Red Onion inmates in the ordinary course of business. After Riddick filed his response, ECF No. 50, the defendants filed a reply with a supplemental declaration from Trapp, ECF No. 58, to which Riddick also responded, ECF No. 67. Thus, the court finds the defendants' motion to be ripe for disposition.

II.

The court should grant summary judgment only when the pleadings and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[5] Riddick alleges that NP Ball delayed having Riddick examined by a neurologist until "after the numbness went away." Id. at 24.

4

party." Anderson, 477 U.S. at 248. On summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. Id. at 255. To be successful, the moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky., 93 F.3d 230, 233 (6th Cir. 1996).[6]

When a motion for summary judgment is made and is properly supported by affidavits, the nonmoving party may not rest on the mere allegations or denials in his pleadings. Anderson, 477 U.S. at 256. Instead, the nonmoving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find in his favor. Id. at 256-57. Verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

The Prison Litigation Reform Act ("PLRA") provides in 42 U.S.C. § 1997e(a) that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the facility provides to inmates and meet all deadlines within that procedure before filing his § 1983 action. See Woodford v. Ngo, 548 U.S. 81, 90-94

---

[6] The court has omitted internal quotation marks, alterations, and/or citations here and throughout this opinion, unless otherwise noted.

(2006) (finding inmate's filing of untimely grievance was not "proper exhaustion" of available administrative remedies under § 1997e(a)).

The defendants bear the burden of proving the affirmative defense that Riddick failed to properly exhaust available administrative remedies regarding his claims before filing suit. Jones, 549 U.S. at 216. If the defendants prove that Riddick did not exhaust, he may yet escape summary judgment under § 1997e(a) by showing that the remedies under the established grievance procedures were not "available" to him. Ross v. Blake, 136 S. Ct. 1850, 1859 (2016) (noting that circumstances making prison grievance procedures unavailable "will not often arise"). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Virginia Department of Corrections ("VDOC") Operating Procedure ("OP") § 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints. See gen. Mem. Supp. Mot. Summ. T. Trapp Decl. ¶¶ 6-13, ECF 40-1; Trapp Suppl. Decl. Ex. A, ECF No. 58. OP 866.1 provides that all issues which affect the grievant personally are grievable except those pertaining to policies, procedures, and decisions of the Virginia Parole Board, prison disciplinary hearings, state and federal court decisions, laws and regulations, and other matters beyond the control of the VDOC.

The VDOC grievance procedure requires that, before submitting a formal grievance, an inmate must demonstrate that he has made a good faith effort to informally resolve his complaint. He may do so by submitting an Informal Complaint form to the appropriate department head. Staff should respond in writing on the form within fifteen days. If the inmate is dissatisfied with the response, he must submit a Regular Grievance on the issue within thirty days after the event of which he complains, attaching the Informal Complaint.

A Regular Grievance that meets the filing criteria under OP 866.1 will be logged into the computer database on the day it is received. If the Regular Grievance does not meet the filing requirements, a grievance official will complete the "intake" section on the back of the Regular Grievance form, mark the reason for the rejection (such as an expired time limit or raising more than one issue), and return the Regular Grievance to the inmate with instructions on how to correct and resubmit the form if feasible. If the inmate desires a review of the intake decision, he must send the grievance form to the Regional Ombudsman within five calendar days. However, pursuing that intake appeal alone does not constitute exhaustion. Rather, to satisfy the exhaustion requirement, the grievance must be accepted into the grievance process and appealed through the highest available level of review.

Once a Regular Grievance is accepted for review, officials investigate the inmate's contentions, and the warden or his designee will issue a Level I written response. If dissatisfied with that response, the inmate may appeal for Level II review. All accepted Regular Grievances can receive these two levels of review, and some are eligible for a Level III review.

An inmate may also file an Emergency Grievance when he believes his situation places him at an "immediate risk of serious personal injury or irreparable harm." Trapp Decl. at ¶ 11. Filing an Emergency Grievance does not satisfy the exhaustion requirement of § 1997e(a), because the procedure for filing a Regular Grievance and appeals is still available.

To ensure that all inmates can utilize administrative remedies in a timely manner, inmates must "use those procedures in good faith for problem resolution." Id. at ¶ 12. Inmates "who abuse the grievance procedures by excessive filings or habitual misuse of the procedure hinder other [inmates'] access and impede staff's ability to investigate and resolve complaints within specified

time limits." Id. If an inmate has abused his access to the grievance procedures, officials may limit his access.

> A face-to-face interview should be conducted prior to initially placing an [inmate] on limitation status. If the [warden] determines an [inmate's] access should be limited, an [inmate] may be limited to no less than one informal complaint and one regular grievance per week. Each period of limitation should last no longer than ninety days. The [inmate] will be notified in writing of the reason for the limitation, the number of informal complaints and grievances he is limited to, and the period of limitation. Informal complaints and grievances submitted in excess of the limitation will be returned to the [inmate] without a response. An inmate can grieve the limitation decision and does not need to submit an informal complaint to do so.

Id. at ¶ 13.

Trapp's review of Riddick's grievance file at Red Onion reflects that he did not utilize all stages of the grievance procedure in a timely manner, regarding his claims against the movant defendants. The provisions of the procedure and the copies of Informal Complaints and other filings described in Trapp's declaration are undisputed.

Riddick's deadline under OP 866.1 to submit a Regular Grievance about Nurse Cantrell's alleged treatment decisions to deny him an inhaler and an ice pack on April 5, 2019, expired thirty days later—on May 5, 2019. His deadline to submit Regular Grievances about NP Ball and Nurse McCoy regarding their treatment decisions during his medical evaluation on April 9, 2019, expired on May 9, 2019—thirty days after they allegedly denied him an ice pack, inhaler, and immediate treatment for his wrist and hand injuries. Riddick would also have had to file Informal Complaints early during these thirty-day filing periods to allow staff to respond in time for him to submit timely Regular Grievances with the Informal Complaints attached. Trapp's grievance file review indicates that Riddick did not file either Informal Complaints or Regular Grievances about the defendants' actions before his filing deadlines expired on May 5 and 9, 2019.

Defendants' evidence is that on June 12, 2019, more than a month after the deadlines expired, Riddick submitted Informal Complaint #01156 regarding NP Ball's failure to X ray his hand for injuries he allegedly received on April 5, 2019. His complaint form also requested referral to an outside specialist. Another nurse responded: "Medical just received request on 6-12-19 for this and [you] have been placed on provider list to be seen." Trapp Decl. Ex., at 8, ECF No. 40-1. Riddick filed a Regular Grievance on the same subject on June 24, 2019, which the grievance coordinator rejected and returned to him because the filing period had expired. Riddick appealed the intake decision, but the regional ombudsman agreed that the Regular Grievance was not timely filed. See Resp. Ex. A, ECF No. 50; Trapp Suppl. Decl. ¶ 11, ECF No. 58-1. Riddick argues that this appeal constituted exhaustion. He is mistaken. OP 866.1 plainly provides that exhaustion requires an inmate to submit a <u>timely</u> Regular Grievance and to pursue the finding on the merits of that Regular Grievance through the available review stages, which Riddick failed to do.

Trapp's initial declaration is dated July 23, 2020. It states that review of the grievance file up to that date reflected that Riddick had not submitted either an Informal Complaint or a Regular Grievance about NP Ball's alleged delay in providing pain medication or her alleged delay in referring him to a neurologist. In response to the defendants' motion, Riddick does not offer evidence disputing the defendants' evidence regarding the number or the timing of the Informal Complaints that the Red Onion grievance office processed from him about these defendants during the months after April 5, 2019.

In addition, the defendants offer evidence that although Riddick was under a grievance limitation for a time in 2019, that restriction did not prevent him from exhausting the claims against these defendants. On February 11, 2019, officials served Riddick with a "Grievance Limitation Letter because he exhibited a pattern of excessive filings and habitual misuse and abuse of the

9

grievance process. He was limited to one informal complaint and one grievance per week until May 12, 2019."[7] Trapp Decl. at ¶ 19. Under this restriction, Riddick had five opportunities during the applicable filing periods to submit timely Informal Complaints and Regular Grievances about the medical decisions that NP Ball and Nurses Cantrell and McCoy made. Yet, it is undisputed that no Informal Complaint or Regular Grievance from Riddick about these incidents was processed during those filing periods.

In response to Trapp's declaration, Riddick submits a copy of an Informal Complaint dated April 12, 2019, on which he complains that he told all three of the defendants about the April 5, 2019, incident, the O.C. spray, his asthma, "shortness of breath, heart flutter, chest and head pain [and] pain in [his] ribs." Resp. Ex. 2, ECF No. 50-1. He states that he asked them for an ice pack and an inhaler, but they did not provide these items. In his unverified response to the summary judgment motion, Riddick states that he "submitted" this document on April 12, 2019, and "it was not processed." Resp. 2, ECF No. 50. He seems to imply that this form shows his efforts to exhaust and that officials' alleged failure to process this Informal Complaint and the lack of response shows that the grievance procedure was unavailable to him. The defendants assert that these contentions have no merit, and the court agrees.

The defendants argue that even assuming Riddick attempted to file this Informal Complaint on April 12, 2019, he did not carry out his responsibility to ensure that the Grievance Department actually received and processed that Informal Complaint. According to Trapp,

> [i]nmates are educated on OP 866.1 when they arrive at a [VDOC] facility, and it is included in the Offender Handbook, given to all inmates. To submit an informal complaint, an inmate must send [it] through the institutional mail, either directly or

---

[7] Riddick filed a Regular Grievance challenging the Grievance Limitation Letter as improper. A Level I response on May 9, 2019, determined the Regular Grievance to be unfounded, and that ruling was upheld in the Level II response. Furthermore, defendants present evidence that Riddick had been previously placed on a grievance limitation at least once, beginning in August 2011. Therefore, he was well aware of the types of grievance usage that would result in having his access limited.

10

>through a staff member if the inmate is in restricted housing. It is the inmate's responsibility to ensure that the informal complaint is turned in[ ]to the appropriate staff if in restricted housing. The informal complaint is taken to the mailroom where it is sorted out and sent to the Grievance Department. Once at the Grievance Department, the Informal Complaint will be assigned to the appropriate responding department. It will be entered into VACORIS, the computer-based VDOC offender information management system and assigned a tracking number. VACORIS will automatically generate a receipt with the tracking number on it which will be sent to the inmate through the institutional mail. If an inmate does not receive a submission receipt, he should send the Grievance Department a request form asking if the informal complaint had been received and/or processed.
>
>After the informal complaint is submitted and a receipt is generated, it will then go to the appropriate department for a response. Once the appropriate department makes a response, it is returned to the Grievance Department. The response is then manually typed into VACORIS, it is saved, and a copy is placed in the inmate's physical grievance file. The original form is returned to the inmate through the institutional mail.
>
>When an informal complaint is received, the receipt date and due date are noted on the informal complaint. The tracking number and departmental assignment are both noted on the face of the informal complaint. The response to the informal complaint would be written on the face of the complaint, along with the respondent's name, title, signature, and date of response. When received by the Grievance Department, an informal complaint is stamped indicating that it was received by the Grievance Department and the date of receipt.
>
>If an inmate does not receive a response to an informal complaint after fifteen days, he must file the informal complaint receipt with a grievance as proof of engagement in the informal process.

Trapp Suppl. Decl. at ¶ 5-8, ECF No. 58-1.

The April 12, 2019 Informal Complaint that Riddick submits with his response bears no indication that it was properly submitted. It does not bear a stamp indicating the date it was received in the Grievance Department, it has no date due for a response, it does not include a tracking number, and it has no notation of being forwarded to anyone for a response. No response appears on the bottom of the form. The Grievance Department has no record of this April 12, 2019, filing, and has no record of any request or Informal Complaint from Riddick, inquiring about the status of this filing. Riddick did not attach this document or a receipt for it to any subsequent Regular Grievance as proof that he engaged in the informal resolution process as required.

11

Based on this evidence, the court agrees that the unprocessed Informal Complaint dated April 12, 2019, does not prove that Riddick completed the exhaustion process, nor does it prove that the grievance procedure was unavailable to Riddick.[8] If Riddick had properly filed an Informal Complaint on April 12, 2019, he would have received a receipt, which he could have attached to a timely Regular Grievance, but he failed to do so. If Riddick did not receive a receipt, he could have filed a request or an Informal Complaint inquiring about the filing status of an April 12, 2019, Informal Complaint. But he does not dispute the defendants' evidence that the Grievance Department never received any such status inquiry from Riddick. Most importantly, as already discussed, it is undisputed that Riddick did not file a timely Regular Grievance about the issues described in the April 12, 2019, Informal Complaint—his requests to the defendants for immediate treatment on April 5 and 9, 2019.

Riddick also argues that the thirty-day deadline in OP 866.1 to file a Regular Grievance about a delay of medical care should not begin to run until he had received the requested care. This argument fails under the terms of OP 866.1 itself and the nature of the claims Riddick has asserted against the defendants. OP 866.1 requires grievances to be submitted "within 30 calendar days from the date of [the] occurrence/incident or discovery of the occurrence/incident." Trapp Suppl. Decl. at ¶ 3. The procedure does not provide for any extension of grievance deadlines until an inmate has received the treatment he requested or until his complaint has been resolved. Id. Indeed, the procedure defines a grievance as "[a]n <u>unresolved</u> issue," indicating the intention that the grievance procedure provide a remedy for a problem that was <u>not</u> adequately addressed through informal channels. Id. at ¶ 4. Riddick asserts that Nurse Cantrell did not provide immediate care

---

[8] In addition, Riddick's statement in his response that he submitted the Informal Complaint was not made under penalty of perjury and, therefore, is not competent evidence on summary judgment. See 28 U.S.C. § 1746; Resp. 2, ECF No. 50.

on April 5, 2019, and that NP Ball and Nurse McCoy did not provide immediate care on April 9, 2019. Riddick knew on these dates that he did not receive the care, so these dates triggered the thirty-day filing period under OP 866.1 to file a Regular Grievance on these complaints. Because Riddick did not file a Regular Grievance within thirty days after these dates, he failed to properly exhaust these claims.

Riddick also set timelines on his claim that after NP Ball's initial evaluation of him on April 9, 2019, she delayed prescribing pain medication for his ribs for two months and delayed referring him to a neurologist for his hand issues for three months. Riddick's deadline to file a Regular Grievance on this claim expired thirty days after the specified periods of alleged delay— on August 9, 2019, and September 9, 2020, respectively. Riddick does not dispute the defendants' evidence that he failed to file a timely Regular Grievance referencing NP Ball's alleged delays of these desired treatment related to the April 5, 2019 incident.[9] Thus, he clearly failed to properly exhaust these issues.

Based on the foregoing, the court concludes that Riddick has presented no material disputed fact on which he could show that he properly exhausted administrative remedies as to any of the claims against the movant defendants. He has also presented no material disputed fact on

---

[9] On June 30, 2019, Riddick submitted Informal Complaint #01285 alleging that after he was sprayed with O.C. spray on February 1, 2019, despite his asthma, the defendants failed to x-ray his chest or provide him with an inhaler. He stated that he still did not have an inhaler in June 2019. A Red Onion nurse responded that Riddick would be scheduled to see a provider to discuss his asthma. Dissatisfied with that response, on July 17, 2019, Riddick submitted a Regular Grievance on the same issues, which was rejected at intake because the filing period had expired. Riddick appealed that intake decision, but the regional ombudsman upheld it. See Trapp Decl. at ¶ 17. Riddick argues that even though this Regular Grievance did not mention the April 5, 2019, O.C. spray incident, it put officials on notice that he still did not have an inhaler in June 2019. He also contends that these filings should be considered exhaustion of the inhaler issue, because he filed the appeal of the intake decision, and no one instructed him what he should do differently. The court finds no merit to these arguments. As Riddick admits, Informal Complaint #10285 and the subsequent Regular Grievance on its issues did not relate Riddick's need for an inhaler to the events on April 5, 2019. Moreover, as discussed, exhaustion under OP 866.1 requires the inmate to properly file a Regular Grievance, receive a Level I response on the merits of the complaint, and appeal to Level II, and possibly, to Level III. It is undisputed that Riddick did not properly follow all of these steps regarding his alleged need for an inhaler because of the incident on April 5, 2019.

which he could show that he was prevented, "through no fault of his own," from filing and pursuing timely Informal Complaints, Regular Grievances, and subsequent appeals under OP 866.1 as to all of these claims.[10]  Accordingly, the defendants are entitled to summary judgment as a matter of law under § 1997e(a).  As it is clear from the record that Riddick could not now exhaust administrative remedies under the VDOC procedure as to the claims against these defendants regarding their past treatment decisions and alleged delays, the court will dismiss his claims against them with prejudice under § 1997e(a).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

**ENTER**:  This __29th__ day of March, 2021.

                                           /s/ Glen Conrad
                                        Senior United States District Judge

---

[10] Riddick vaguely alleges that the court should consider the fact that he suffers from mental disorders.  He has offered no evidence here, however, indicating what his disorders are or showing that they hampered him in any way from properly following the steps of the grievance procedure.