IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

|  |  |  |
|---|---|---|
| STEVE RIDDICK, | ) | CASE NO. 7:20cv00081 |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| WARDEN JEFFERY B. KISER, | ) | By:   Hon. Thomas T. Cullen |
| *et al.*, | ) | United States District Judge |
| Defendants. | ) | |

Steve Riddick, a Virginia inmate proceeding *pro se*, filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that prison officials used excessive force against him and disciplined him without due process.[1] The matter is presently before the court on multiple summary judgment motions from the parties. After review of the record, the court concludes that the defendants are entitled to summary judgment as to some claims, but that other claims will require further factual development on the issue of exhaustion.

## I.   BACKGROUND

At the time his claims arose, Riddick was incarcerated at Red Onion State Prison ("Red Onion"), a facility operated by the Virginia Department of Corrections ("VDOC"), where he is currently confined. In Riddick's verified amended complaint as supplemented by several later submissions, he alleges the following sequence of events on which he bases his claims.

---

[1] Riddick currently has at least 10 suits, including this one, alleging various violations of 42 U.S.C. § 1983 pending in this court. *See Riddick v. Mullens*, 7:20cv00096 (alleging excessive force and denial of medical care); *Riddick v. Trent*, 7:20cv00447 (alleging denial of mental health treatment); *Riddick v. Lambert*, 7:20cv00448 (alleging retaliation and unconstitutional living conditions); *Riddick v. Mathena*, 7:20cv00449 (alleging unequal treatment and restrictive confinement conditions); *Riddick v. Mickles*, 7:20cv00559 (alleging unconstitutional living conditions and retaliation); *Riddick v. Moore*, 7:20cv00560 (alleging false disciplinary charge and retaliation); *Riddick v. Kegley*, 7:20cv00562 (alleging due process violations and retaliation); *Riddick v. Collins*, 7:20cv00742 (alleging failure to protect and retaliation); and *Riddick v. Kiser*, 7:21cv00178 (alleging religious rights violations).

On April 5, 2019, at around 6:00 a.m., Riddick awoke when someone knocked on his cell door; he had not heard an announcement for count. When he went to the door, he saw Sergeant B. Taylor. Riddick asked who was knocking and why no one had announced count. B. Taylor said that staff were "checking on" him. (Am. Compl. 5 [ECF No. 12].)[2]

A minute later, Captain S. Franklin and Lieutenant J. Fleming came to Riddick's cell door.[3] Fleming yelled at Riddick that he "was about to be a shitty [n****r[4] and] he was going to beat [his] black ass," that it was "time to pay the rent," and called him a "stupid bitch." (*Id.* at 5-6.) Afraid the officers were about to "start something," Riddick walked to the back of his cell. (*Id.* at 7.) The officers told him "to strip and put [his] shit in the box, [he was] going on ambulatory restraints." (*Id.*) He asked why, since he did not believe he was a threat to safety and was not being disruptive. Fearing "retaliation" and that he was about to be attacked, Riddick refused to come to the door to be handcuffed. (*Id.* at 8.) Riddick believed he "had a right to say no to be being [*sic*] put on ambulatory restraints." (*Id.*) Riddick alleges that B. Taylor then sprayed Riddick three times with "O.C. spray[5] [and] once straight in [the] face."

---

[2] For the sake of consistency, all page cites to the record in this Opinion refer to the page numbers assigned to the documents by the court's electronic filing system.

[3] The amended complaint refers to this defendant as J. Flemming, but the defendants' pleadings indicate that he is properly called J. Fleming. The court will amend the docket accordingly.

[4] The court has abbreviated this vile, racist epithet.

[5] Oleoresin Capsicum or O.C. spray is a chemical agent similar to what is commonly known as pepper spray or mace. It irritates a person's eyes, throat, and nose. *See Park v. Shiflett*, 250 F.3d 843, 848-49 (4th Cir. 2001) (describing the physiological effects of OC spray). "The effects of OC spray include (1) dilation of the capillaries and instant closing of the eyes through swelling of the eyelids, (2) immediate respiratory inflammation, including uncontrollable coughing, retching, shortness of breath and gasping for air with a gagging sensation in the throat, and (3) immediate burning sensations to the mucous membranes, skin and inside the nose and mouth." *Id.* at 849.

(*Id.* at 9.) C. Taylor, D. Taylor, B. Branham (at other times referred to in the record as Brahan or Bradley), D. Stallard, and J. Jones[6] allegedly entered Riddick's cell and pushed him to the floor. Riddick claims One officer "punched" him in his left ribs "in an upward motion as to break" his ribs four times.[7] (*Id.*) Riddick states that he did not resist the officers' efforts to restrain him in the cell.

The officers quickly removed Riddick from his cell and escorted him to the pod shower to rinse off the O.C. spray. Riddick alleges that the officers oved him to a nearby cell and placed him in ambulatory restraints.[8] (*Id.* at 10.) Nurse Cantrell reported to the cell where Riddick was being held to assess the placement of the restraints. Riddick alleges she "never said a word to [him and] only communicated with the officers." (*Id.*) Riddick claims he asked her for an inhaler because he was "short-winded," but she did not respond.[9] (*Id.*) He told her that he thought his ribs were broken.

Riddick also alleges that either "D. Taylor or Stallard forcefully squeezed [his] hands [and] wrist [*sic*] as to break them when the ambulatory restraints were being" adjusted. (*Id.* at 11.) The tight restraints caused a vein in Riddick's left hand to swell.

---

[6] Riddick's claim against J. Jones was added to the complaint later in the case by amendment (ECF Nos. 126-27).

[7] Riddick initially alleged that the officer who punched him was "Stallard or D. Taylor." (Am. Compl. at 9 [ECF No. 12].) Later, he stated that Jones "may have struck me with his fist," since Jones worked in another unit, and Riddick did not know the officer who punched him. (ECF No. 126)

[8] According to defendants' evidence, ambulatory restraints consist of handcuffs and ankle restraints connected with a chain between them. An inmate in ambulatory restraints should be able to walk in short strides and move his hands a limited distance, for example, to allow him to walk to, and use, the toilet without assistance.

[9] The court granted summary judgment for the medical defendants in this case in a previous memorandum opinion and order (ECF Nos. 156 & 157).

Riddick claims he stayed in ambulatory restraints for about eight hours, from 6:30 a.m. to 2:00 p.m. (*Id.* at 13.) He says the restraints were not adjusted so that he could use the toilet, wash, get water, or eat. The handcuffs cut into his wrists, leaving bruises. His boxer shorts got caught in a chain so that he was unable to pull them up above his knees, leaving his genitals and buttocks exposed to staff, including female staff. Riddick told B. Taylor that he could not pull up his boxers, but the officer took no action to correct this situation. (*Id.*)

When Stallard, D. Taylor, and B. Branham released Riddick from the ambulatory restraints around 3:00 p.m., Riddick alleges they "squeezed [his] hands forcefully," hurting his hands that were already painful. (*Id.* at 14.) Nurse April Mullins came and checked Riddick after his release from the ambulatory restraints. He told her that his left ribs were sore and might be fractured and asked for an ice pack and an inhaler. He also showed her the bruises on his wrists, the swollen vein in his left hand, and complained of chest discomfort. Nurse Mullins said, "Alright," and rubbed her hand over Riddick's left ribs. (*Id.*) She did not provide pain medication, an ice pack, or an inhaler. According to Riddick, his "wrists and hands stayed numb for [two] months," and his ribs were sore for a month. (*Id.* at 12.) He states that his "left rib sticks out" to this day. (*Id.*)

At some point, Riddick claims that he asked Investigator J. Bentley to provide him with the name of the officer who punched him during the cell extraction because it was not an officer he knew. Riddick alleges that Investigator J. Bentley refused to respond to his requests, which Riddick characterizes as "deliberate[ ] indifference" and "retaliation." *Id.* at 24, 26, 28.

On April 5, 2019, after the cell extraction, B. Taylor wrote two disciplinary charges against Riddick, charges that Riddick claims were "fabricated": a "212" charge for threatening

bodily harm and a "201" charge for disobeying an order. (*Id.* at 29.) On April 15, 2019, Disciplinary Hearing Officer ("DHO") Larry Mullens found Riddick guilty of both charges. As penalties, Mullens imposed 60 days of telephone restriction for the 212 charge, and 30 days of telephone restriction for the 201 charge. Riddick requested witness statements from inmates who he claims had told him they heard the conversations during the cell extraction on April 5, 2019. Mullens denied these witness requests, finding that the inmates could not have heard what took place, given the distance between their cells and Riddick's cell. Warden Kiser and regional administrator Elam upheld Mullens' findings on appeal. Riddick contends that these defendants acted as they did "out [of] retaliation." (*Id.* at 33.)

Riddick complains that some personal property items which went missing after the cell extraction still have not been returned to him, including an orange wool hat, paperwork, grievances, hygiene products, and mail from family. He contends that C. Taylor and C. Combs withheld the missing property items "out of retaliation" for the cell extraction. (*Id.* at 33-34.)

Liberally construed, Riddick's amended complaint and later supplemental amendments allege the following claims: (1) Sergeant B. Taylor used unnecessary force against Riddick on April 5, 2019, when he sprayed him with O.C. gas and put him in ambulatory restraints; (2) Officers C. Taylor, D. Taylor, B. Branham, D. Stallard, and J. Jones used excessive force when they entered Riddick's cell and pushed him to the floor and either Stallard, D. Taylor, or J. Jones punched him four times in the ribs; (3) Lieutenant Fleming and Captain Franklin used excessive force by ordering Riddick placed in ambulatory restraints; (4) Nurse April Mullins failed to provide an ice pack, an inhaler, or pain medication once Riddick was released from ambulatory restraints; (5) Investigator Bentley violated Riddick's rights by refusing to provide

the identity of the officer who punched him that day; (6) B. Taylor fabricated two disciplinary charges against Riddick based on events of April 5, 2019, in retaliation; (7) DHO Larry Mullens denied Riddick witness statements at the disciplinary hearings and found him guilty of the offenses out of retaliation for the cell extraction; (8) Warden Kiser and regional director Elam upheld Mullens' findings during disciplinary appeal proceedings in retaliation; (9) by failing to return all of Riddick's property items, Officers Combs and C. Taylor violated his due process rights and his First Amendment rights in retaliation for the cell extraction; (10) grievance coordinator G. Adams unfairly rejected Riddick's grievance about the cell extraction out of retaliation; and (11) Nurse Phillips was deliberately indifferent when she authorized officers to use O.C. spray on Riddick despite his history of asthma (Mot. Amend. 1 [ECF No. 100]).

Defendant Larry Mullins, Captain S. Franklin, Lt. J. Fleming, Sgt. B. Taylor, C. Taylor, D. Taylor, D. Stallard, James Bentley, and Gary Adams have filed an answer and a motion for summary judgment, arguing that Riddick's § 1983 claims are without merit. (ECF Nos. 79 & 80). Later, they amended their answer and filed a supplemental motion for summary judgment (ECF No. 185), asserting that several of Riddick's claims should be dismissed because he failed to exhaust available administrative remedies before filing this lawsuit, as required under 42 U.S.C. § 1997e(a). Four defendants—Nurse Phillips, Nurse April Mullins, Officer C. Combs, and Officer J. Jones—have also moved for summary judgment for failure to exhaust administrative remedies. (ECF Nos. 160 & 177.) Riddick has responded to these motions with cross-motions for summary judgment (ECF Nos. 92, 171, & 198).

## II.  DISCUSSION

### A.  Standards of Review

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials.

*Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).[10]

The defendants have filed supporting affidavits and documentation. Accordingly, to avoid summary judgment, Riddick must present sufficient evidence that could carry the burden of proof of his claims at trial. *See id.* He "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Anderson*, 477 U.S. at 248. A *pro se* litigant's verified complaint must be considered as an affidavit and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

"Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."

---

[10] The court has omitted internal quotation marks, alterations, footnotes, and/or citations here and throughout this memorandum opinion, unless otherwise noted.

*Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). "[U]nsupported speculation is not sufficient to defeat a summary judgment motion." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992). The court's inquiry is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).

## B.  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). To comply with § 1997e(a), an inmate must properly follow each step of the established grievance procedure that the facility provides to inmates and meet all deadlines within that procedure before filing his § 1983 action. *See Woodford v. Ngo*, 548 U.S. 81, 90–94 (2006). An "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement. *Id.* at 83–84.

The defendants bear the burden of proving the affirmative defense that Riddick failed to properly exhaust available administrative remedies regarding his claims before filing suit. *Jones*, 549 U.S. at 216. If the defendants prove that Riddick did not properly exhaust his administrative remedies, he may avoid summary judgment under § 1997e(a) by showing that the remedies under the established grievance procedures were not "available" to him. *Ross v.*

*Blake*, 136 S. Ct. 1850, 1859 (2016) An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see also Ross*, 136 S. Ct. at 1858-60.

    *1.  VDOC Grievance Procedures.*

    VDOC Operating Procedure ("OP") § 866.1, Offender Grievance Procedure, is the mechanism used to resolve inmate complaints. (*See gen.* Mem. Supp. Mot. Summ. J. Ex. A, C. Meade Aff. ¶ 4 & Encl. A [ECF 178-1].)[11] The VDOC grievance procedure requires that, before submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to informally resolve his complaint. Except in limited circumstances, he may do so by submitting an informal complaint form to the grievance department. The grievance staff "will issue a receipt to the inmate" and will route the informal complaint to the appropriate department for investigation and a response. (*Id.* at ¶ 6.) Procedure calls for a written response to an informal complaint to be sent to the inmate within 15 days. If the inmate is dissatisfied with the response, his next step is a regular grievance.

    A regular grievance must be submitted to the grievance department within 30 days from the date of occurrence. When filing a regular grievance, the inmate should attach the informal complaint form to his regular grievance form as "documentation of his attempt to informally resolve the issue." (*Id.* at ¶ 7.)

    If the regular grievance does not meet the filing requirements, a grievance official will complete the intake section on the back of the form, mark the reason for the rejection (such

---

[11] *See also* Mem. Supp. Mot. Summ. J. Ex. A, Meade Decl. [ECF No. 161]; Mem. Supp. Mot. Summ. J. Meade Aff. [ECF No. 186-1].

as failing to utilize the informal procedure or filing outside the required time limit), and return the form to the inmate with instructions on how to correct and resubmit the regular grievance, if feasible. If the inmate desires a review of the intake decision, he must send the grievance form to the regional administrator within five calendar days. However, pursuing that intake appeal alone does not constitute exhaustion. *See Jackson v. Barksdale*, No. 7:17cv00031, 2017 WL 3446259 at *5 (W.D. Va. Aug. 10, 2017) (Sargent, M.J.) ("[S]uch final intake decisions do not constitute exhaustion of administrative remedies."), *aff'd*, 707 Fed. App'x 786 (4th Cir. 2018); *Hailey v. Clary*, No. 7:17cv00260, 2018 WL 2123623 at *2 (W.D. Va. May 8, 2018) (Urbanski, C.J.). To satisfy the exhaustion requirement, a regular grievance *must* be accepted into the regular grievance process and appealed through the highest available level of review.

Once a regular grievance is accepted for review, officials investigate the inmate's contentions, and the warden or his designee will issue a Level I written response. If the inmate is dissatisfied with that response, he may appeal for Level II review by mailing the regular grievance, the response, and the informal complaint and response to the regional administrator or other specified official. Some, but not all, regular grievances may be appealed for Level III review. For those that cannot be appealed to Level III, Level II is the final level of review.

To ensure that all inmates can utilize administrative remedies in a timely manner, inmates must "use those procedures in good faith for problem resolution." (Meade Decl. ¶ 13 [ECF No. 161-1].) If an inmate has abused his access to the grievance procedures, the warden may limit his access

> to no less than one informal complaint and one regular grievance per week. Each period of limitation should last no longer than ninety days. The [inmate] will be notified in writing of the reason for the limitation, the number of informal complaints and grievances he is limited to, and the period of limitation.

Informal complaints and grievances submitted in excess of the limitation will be returned to the [inmate] without a response.

(*Id.* at ¶ 14.)


### 2. *Exhaustion Regarding the Incident on April 5, 2019*

The majority of Riddick's claims in this lawsuit center around events that  allegedly occurred on April 5, 2019: O.C. spray, cell extraction, ambulatory restraints, and denial of an ice pack and an inhaler. Under OP 866.1, the deadline for Riddick to file a regular grievance about these events was May 5, 2019. On April 11, 2019, the Red Onion grievance department received informal complaint #729 from Riddick, complaining that officers had utilized O.C. spray against him, entered his cell and assaulted him, and placed him in ambulatory restraints on April 5, 2019. This informal complaint, with B. Taylor's response, was sent back to Riddick on April 22, 2019. (Meade Decl. Ex. B 18-19 [ECF No. 161-1].)

On April 30, 2019, the grievance department received a regular grievance from Riddick. It was dated April 23, 2019. In it, Riddick complained about being sprayed with O.C. spray on April 5, 2019, when he had not done anything wrong, the cell extraction, and ambulatory restraints. On April 30, 2019, G. Adams, the interim grievance coordinator, rejected this regular grievance at intake and checked the box on the form, indicating rejection because Riddick had not documented his compliance with "the informal process to resolve [his] complaint." (Meade Aff. ¶ 14 [ECF No. 178-1].) Meade, the current grievance coordinator at Red Onion, surmises that Adams rejected the regular grievance as he did because Riddick had not attached his informal complaint. According to Meade and her review of Riddick's Red

Onion grievance file, Riddick did not appeal the intake decision or resubmit his regular grievance with informal complaint #729 attached.

On April 30, 2019, Riddick was under a 90-day grievance limitation imposed in February 2020 and was only allowed to file one informal complaint and one grievance per week. (Meade Decl. Encl. B 22 [ECF No. 161-1].) In her affidavit, Meade stated, that, if Riddick had resubmitted his regular grievance with the informal complaint attached in the week following April 30, 2019, it would have been accepted at the grievance department because Riddick had not yet filed any other regular grievance that week. (Meade Decl. ¶ 21 [ECF No. 161-1].)

Based on this evidence, the defendants argue that Riddick did not properly exhaust administrative remedies before filing his claims related to the April 5, 2019 incident. Riddick does not dispute Meade's evidence about the contents of his Red Onion grievance file. Therefore, the court concludes that the defendants have shown that Riddick failed to exhaust his administrative remedies with regard to the April 5 incident. *Jones*, 549 U.S. at 216. Under applicable law, the burden now shifts to Riddick to present evidence on which he could persuade a fact finder that the remedies under the VDOC procedures were not "available" to him, through no fault of his own. *Ross*, 136 S. Ct. at 1859; *Moore*, 517 F.3d at 725.

Riddick argues that he made appropriate efforts to exhaust properly, but he was prevented from doing so by circumstances beyond his control. According to his verified response to the defendants' exhaustion arguments and affidavit, Riddick filed his initial regular grievance about the April 5, 2019 incident—with the informal complaint #729 attached—to the grievance department on April 23, 2019. (Resp. 5-6 [ECF No. 198]; Riddick Aff. 2 [ECF

No. 198-1].) He contends the grievance department wrongfully rejected these documents and returned them to Riddick. The night he received the rejection, Riddick "returned them to the grievance [office] stating on the grievance that [he'd]submitted the inf[ormal complaint] with [his] initial grievance." (Resp. 1.) The informal complaint and regular grievance were returned to Riddick a second time with no response. At this point, Riddick states, he "submitted them to the regional [and] didn't get them back." (*Id.* at 2.) He attached a copy of a notarized document informing the regional administrator of this sequence of events. (*Id.* Attach. 8 [ECF No. 198-2].)

On the current record, the court cannot find that the defendants are entitled to summary judgment under § 1997e(a) for failure to exhaust available administrative remedies as to the use of O.C. spray, the cell extraction, and the ambulatory restraints on April 5, 2019. Riddick has presented evidence sufficient to create disputes regarding genuine issues of material fact regarding whether his efforts to properly exhaust were thwarted by Adams's mistaken rejections of Riddick's timely regular grievances with the informal complaint attached and by the lack of response to his attempted appeal of this rejection to the regional administrator. In other words, Riddick may be able to show that the remedies procedures were not available to him under the circumstances he faced in the spring and summer of 2019. *Ross*, 136 S. Ct. at 1859; *Moore*, 517 F.3d at 725.

For the reasons stated, the court concludes that the defendants' motions for summary judgment under § 1997e(a) as to claims (1), (2), (3), and (11), regarding the use of O.C. spray, the cell extraction, and the ambulatory restraints against Riddick on April 5, 2019, must be denied. Specifically, the court will deny Nurse Phillips' motion for summary judgment (ECF

No. 160) based on Riddick's alleged failure to exhaust available remedies as to claim (11) alleging that she authorized the use of O.C. gas against him that day. The court will also deny summary judgment under § 1997e(a) for J. Jones (claim (2)), who participated in the cell extraction and may have punched Riddick. (*See* Mot. Summ. J. [ECF No. 177].) The court will deny the supplemental motion for summary judgment under § 1997e(a) (ECF No. 185) filed by G. Adams, B. Branham, Marcus Elam, J. Fleming, S. Franklin, Jeffery B. Kiser, D. Stallard, B. Taylor, C. Taylor, and D. Taylor.[12] The court will refer the disputed exhaustion matters to the magistrate judge for further proceedings on this issue, including an evidentiary hearing. Accordingly, the portions of the defendants' motion for summary judgment (ECF No. 80) on the merits of Riddick's claims (1), (2), (3), and (11), will be dismissed without prejudice to their right to file a second motion seeking summary judgment on the merits, as warranted by the outcome of the proceedings on exhaustion.

The court will also deny Riddick's motions for summary judgment (ECF Nos. 92, 171, and 198). His summary judgment motion is not verified and merely restates some of his allegations. The other summary judgment motions present evidence and argument that he attempted exhaustion and was prevented from doing so through no fault of his own. None of these motions satisfies the rigorous standard for summary judgment by showing that the evidence is "so one-sided" that he must prevail as a matter of law. *McAirlaids, Inc.*, 756 F.3d at 310.

---

[12] Defendant Bentley was also a party to this motion. But Riddick, in one response, has acknowledged that he has no constitutional claim against Bentley related to the investigation of the April 5, 2019, incident and Bentley's refusal to provide him with an officer's name. (*See* Resp. 1-2 [ECF No. 203].) The court construes this submission as a motion for voluntary dismissal of the claim against Bentley, which will be granted.

### 3. Exhaustion Regarding Nurse April Mullins

According to Meade's review of Riddick's grievance file, he did not file an informal complaint or regular grievance alleging that Nurse April Mullins provided him inadequate medical care when she assessed his condition upon release from ambulatory restraints on April 5, 2019. Riddick does not offer any evidence to refute this omission and has not presented any evidence to show that he was prevented from filing grievance documents about these claims. Therefore, the court concludes that Mullins' motion for summary judgment on the ground that Riddick failed to exhaust administrative remedies (ECF No. 177) must be granted. The record evidence indicates that, under the timetables in the VDOC grievance procedures, Riddick could not now begin or complete the exhaustion process as to this claim. Therefore, the court will dismiss claim (4) with prejudice.

### 4. Exhaustion Regarding C. Combs

In claim (9), Riddick alleges that C. Combs and C. Taylor failed to return certain personal property items to him after the cell extraction on April 5, 2019, in "retaliation for the cell extraction." (Am. Compl. 33-34 [ECF No. 12].) Meade's grievance file review reflected that Riddick submitted informal complaint #1154, dated June 11, 2019, complaining that after his cell extraction on April 5, 2019, several items of personal property were not returned to him. Sgt. Taylor responded to the informal complaint on June 20, 2019: "You were given everything that was inventoried back." (Meade Aff. Encl. D 28 [ECF No. 178-1].) Riddick then filed a regular grievance dated June 27, 2019, complaining about the missing property items. Adams rejected the regular grievance at intake because Riddick had not submitted it within 30 days of April 5, 2019, when his property was not returned to him. Adams also

indicated that Riddick had five calendar days to appeal the intake decision to the regional office. Meade found no evidence in the grievance file indicating that Riddick pursued such an appeal. Meade also found no informal complaint or regular grievance from Riddick that complained of Combs retaliating against him by withholding personal property items.

Combs argues that because Riddick did not file a timely regular grievance about the missing property items or retaliation, he failed to exhaust administrative remedies as to his property claims. Riddick does not dispute the accuracy of Meade's grievance file evidence here, nor does he offer evidence showing that the grievance remedies were unavailable to him. Therefore, the court will grant summary judgment under § 1997e(a) for defendant Combs because Riddick failed to exhaust. Because Riddick could not now exhaust this claim under VDOC procedures, the court will dismiss the claim (9) against Combs with prejudice.[13]

## C. Disciplinary Proceedings

---

[13] Counsel for C. Taylor did not move for summary judgment on his behalf under § 1997e(a) as to claim (9). But it is clear from the record before the court that Riddick is barred under § 1997e(a) from proceeding with this property claim against C. Taylor. In any event, the allegations simply do not state any constitutional claim against C. Taylor.

"[W]here a loss of property is occasioned by a random, unauthorized act by a state employee, rather than by an established state procedure, the state cannot predict when the loss will occur"; therefore, "if a meaningful post-deprivation remedy for [such a] loss is available," the inmate has no constitutional due process claim, regardless of whether the employee's actions were intentional or the result of negligence. *Hudson v. Palmer*, 468 U.S. 517, 532, 533 (1984). Inasmuch as Riddick possessed tort remedies under Virginia state law for the missing property items through the Virginia Tort Claims Act, *see* Va. Code Ann. § 8.01-195.3, he cannot prevail in a constitutional claim under § 1983 to recover the value of the alleged property loss in this case.

Furthermore, Riddick's claim that Taylor and Combs withheld his property to retaliate against him for the cell extraction is without merit. In failing to comply with orders so that he could be removed from the cell under normal procedures, which Riddick admits, he was not exercising any constitutionally protected right to free speech or to petition government officials so as to trigger constitutional protection against retaliation. *See Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) ("*Martin II*"); *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) ("*Martin I*") (to state First Amendment retaliation claim, Riddick "must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between [Riddick's] protected activity and the defendant's conduct"). Thus, the court will summarily dismiss Riddick's § 1983 claim (9), alleging that C. Taylor retaliated against him by withholding personal property items after the April 5, 2019, cell extraction, with prejudice.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

When a disciplinary penalty does not affect the length of an inmate's term of confinement, his constitutionally protected liberty interests are generally limited to freedom from restraint that imposes atypical and significant hardship on him in relation to the ordinary incidents of prison life. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (holding that disciplinary segregation did not present the type of atypical, significant deprivation in which a state might create a liberty interest). When an inmate's disciplinary conviction subjects him to deprivation of a constitutionally protected interest, he has certain, limited rights to procedural protections: "(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). If the disciplinary penalty imposed on Riddick did not deprive him of a constitutionally protected interest,

however, then he had no federal due process right to particular procedural protections before the hearing-officer-imposed penalties. *Sandin*, 515 U.S. at 484.

In Claims (6), (7), and (8), Riddick contends that B. Taylor falsely charged him with disobeying an order and threatening bodily harm; DHO Mullins denied inmate witnesses, found him guilty, and penalized him a loss of telephone privileges for 90 days; and Kiser and Elam upheld those findings. Riddick also contends that these defendants took the challenged actions to retaliate against him for the cell extraction. (Am. Compl. 29-33 [ECF No. 13].) The court finds no actionable constitutional claim here.

First, an "inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). His right is "not to be deprived of a protected liberty interest without due process of law." *Id.* Thus, for any constitutionally significant claim, Riddick must show deprivation of such an interest.

Second, Riddick has no protected liberty interest in uninterrupted telephone privileges. Because "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," use of a temporary withholding of privileges as "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 486. Thus, Riddick's disciplinary penalties involving a temporary loss of telephone privileges do not give rise to a protected interest under the Due Process Clause. *See, e.g., Cooper v. Duncan*, No. 7:16CV00578, 2017 WL 2271501, at *3 (W.D. Va. May 23, 2017); *White v. Mullins*, No. 7:09CV00307, 2009 WL 2315509, at *2 (W.D. Va. July 27, 2009) (disciplinary penalty of temporary loss of telephone

privileges did not trigger federal due process protections); *Pinkney v. U.S. Dep't of Justice*, No. CIV.A. 1:07CV132, 2009 WL 385476, at *2 (60-day loss of telephone privileges did not implicate any protected liberty interest, so inmate not deprived of due process by being prevented from calling witnesses).

Third, Riddick has not shown that the telephone penalties affected the length of his confinement such that the imposed punishment triggered a protected liberty interest. *See Sandin*, 515 U.S. at 487. Thus, Riddick has no actionable claim that he was deprived of a federal right to any particular procedural protections in the challenged disciplinary proceedings. *Id.* at 484 (holding that, if a federally protected liberty interest is not at stake, then the inmate has no right to federal procedural protections).

For the stated reasons, the court concludes that the allegedly false charges, the denial of witnesses, the guilty findings and penalties, and the unsuccessful appeals did not implicate any federally protected liberty interest or otherwise give rise to a federal due process claim actionable under § 1983. Therefore, the court will grant the defendants' summary judgment motion (ECF No. 80) as to the due process elements of claims (6), (7), and (8).[14]

---

[14] The defendants argue that even if Riddick had some protected liberty interest in communicating by telephone, they are entitled to summary judgment on this claim because they have qualified immunity. The court must agree. Qualified immunity "shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013). Clearly established law relevant in this context refers to decisions of the Supreme Court of the United States, the Court of Appeals for the Fourth Circuit, and the Supreme Court of Virginia. *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). The Supreme Court, Fourth Circuit, and the Supreme Court of Virginia have not held that a loss of telephone privileges implicates a protected liberty interest for purposes of procedural due process claims. Accordingly, even if the penalties that Riddick received for his disciplinary convictions implicated protected liberty interests, the defendants in this case are entitled to qualified immunity against Riddick's claims for monetary damages.

Riddick's allegations also fail to support any viable retaliation claim against these defendants. A key component of a § 1983 retaliation claim is that the plaintiff's exercise of a constitutionally protected right motivated an adverse action against him by the defendant. *Martin II*, 977 F.3d at 299; *Martin I*, 858 F.3d at 249. Riddick does not identify, nor can the court find, any constitutionally protected right that he enjoyed allowing him, without consequence, to refuse to comply with prison officials' orders to follow required procedures to exit his cell. The court will therefore grant summary judgment for the defendants as to the retaliation elements of claims (6), (7), and (8).

## D.  Grievance Proceedings

Finally, the court will also grant summary judgment to G. Adams on claim (10), alleging denial of a grievance in retaliation. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). As such, by simply denying a grievance, Adams did not deprive Riddick of any constitutionally protected right. *Id.* Moreover, Riddick's allegation of retaliation by Adams is conclusory and is not connected to the exercise of any constitutionally protected right, as required to state a § 1983 claim. *See Martin I*, 858 F.3d at 249; *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) (noting that the bare assertion of retaliation unsupported by acts is not sufficient to state § 1983 claim). For these reasons, the court will grant the motion for summary judgment (ECF No. 80) as to claim (10) against Adams.

## III.   CONCLUSION

For the reasons stated, the court will deny summary judgment on the ground of failure to exhaust administrative remedies as to claims (1), (2), (3), and (11), regarding the April 5, 2019, incident. The court will grant summary judgment for failure to exhaust administrative remedies as to claims (4) and (9) regarding Nurse Mullins and Combs. The court will summarily dismiss claim (9) against B. Taylor. Finally, the court will grant Riddick's motion to dismiss claim (5) against Bentley and will grant the defendants' summary judgment on the merits as to claims (6), (7), (8), and (10). Riddick's motions for summary judgment (ECF Nos. 92, 171, and 198) will be denied. The exhaustion disputes as to claims (1), (2), (3), and (11) will be referred to the magistrate judge for appropriate further proceedings.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to Riddick and to counsel of record for the defendants.

**ENTERED** this 30th day of September, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE
